587 S.E.2d 683

**The STATE, Respondent,**

v.

**John Edward WEIK, Appellant.**

**No. 25526.**

Supreme Court of South Carolina.

Heard June 25, 2002.
Decided Sept. 3, 2002.
Certiorari Denied June 16, 2003.

Assistant Appellate Defender Robert M. Dudek, of the South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia; and Solicitor Walter M. Bailey, of Summerville, for respondent.

Justice PLEICONES.

Appellant was convicted of first degree burglary and murder, and received a death sentence upon the finding of burglary and physical torture as aggravating circumstances. This opinion combines appellant's direct appeal and this Court's mandatory sentencing review pursuant to S.C. Code Ann. § 16-3-25 (1985). We affirm.

### Facts

Appellant and the victim had a ten-year-old son who lived with the victim. On April 30, 1998, as he finished his shift at work, appellant told his supervisor that he was troubled with events going on in his personal life about his son and that he planned to go to the victim's home that evening to try to resolve the problems. Appellant told his supervisor he might not be at work the next day because he was unsure what would happen. After returning to his home, appellant had a telephone conversation with his son, then left for the victim's trailer. He had a loaded shotgun in his truck.

Appellant and the victim were observed arguing on the victim's porch. Appellant stated that the victim told him he would not be able to see his son anymore. A neighbor observed the victim enter her trailer, and saw appellant go to his truck and return to the trailer carrying the shotgun.

Appellant kicked open the door. Witnesses heard a shot; one heard a scream. Another witness testified that a minute to a minute and a half passed before more shots were fired. When appellant left the scene in his truck, a neighbor entered the trailer and found the victim dead inside. Appellant's son and the victim's young daughter, both of whom were in the trailer during the shooting, were unhurt.

Police officers were notified of the shooting; appellant was stopped not far from the scene. He confessed to two different officers at the roadside, and asked for the death penalty. Appellant gave a taped confession later that evening, and then wrote a statement. He consistently asked for the death penalty, and stated that a voice had told him to shoot the victims. He told others he had observed the shooting as if watching it on a monitor or screen.

Appellant admitted shooting the victim first in the arm, then in the chest, then the stomach, and again in the upper chest and face. The victim was shot from close range with a 12 gauge automatic shotgun loaded with three inch 00 buck shot. The pathologist identified at least five shotgun wounds, and testified that the arm wound would have been extremely painful.

## Issues

Appellant raises six issues on appeal:

1. Whether the trial court erred in finding appellant competent to stand trial following the pretrial *Blair* [1] hearing?;
2. Whether the trial court erred in refusing to accept appellant's offer to plead guilty but mentally ill (GBMI)?;
3. Whether the trial court erred in refusing to hold a second competency hearing at the conclusion of the evidentiary presentation in the guilt phase of the trial?;
4. Whether the trial court erred in not submitting GBMI as a form of the verdict in the guilt phase?;
5. Whether the court erred in admitting twelve color photographs in the penalty phase of the trial?; and
6. Whether appellant's death sentence is disproportionate to the crime?

We address these issues below.

## 1. Competency

The week before appellant's trial commenced the judge conducted a *Blair* hearing to determine appellant's competency to stand trial. Both the State's experts and appellant's experts agreed that appellant suffers from a mental disorder,[2] and that he was not a malingerer. They disagreed, however, whether appellant's condition rendered him incompetent to stand trial.

---

1. *State v. Blair*, 275 S.C. 529, 273 S.E.2d 536 (1981).

2. The State's experts diagnosed appellant as suffering from schizotypal personality disorder while appellant's experts diagnosed paranoid schizophrenia. All agreed that appellant was hyper-religious, heard voices, and suffered from paranoid beliefs involving the CIA and the Masons.

■ The test for determining competency to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as a factual understanding of the proceedings against him. *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *State v. Reed,* 332 S.C. 35, 503 S.E.2d 747 (1998). Competency is required to ensure that [the defendant] has the capacity to understand the proceedings and to assist counsel. *Godinez v. Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). The defendant bears the burden of proving his lack of competence by a preponderance of the evidence, and the trial judge's ruling will be upheld on appeal if supported by the evidence and not against its preponderance. *State v. Reed, supra.*

The trial judge determined appellant was competent to stand trial based on the opinions of the State's experts, and on his own observations of appellant. We find no error. *See e.g. State v. Kelly,* 331 S.C. 132, 502 S.E.2d 99 (1998); *State v. Bell,* 293 S.C. 391, 360 S.E.2d 706 (1987).

## 2. Plea

■ During the arraignment in the jury's presence, the trial judge asked whether appellant was pleading guilty or not guilty. Appellant's attorneys were permitted to approach, and an off-the-record bench conference was held. One of appellant's attorneys then stated, Your honor, [appellant] intends to plead guilty, but mentally ill.

The jury venire was qualified, and the potential jurors divided into panels. Before individual *voir dire* began, there was a colloquy between the trial judge and appellant. During this session, appellant told the judge he wanted to plead guilty to murder. When the judge defined the elements of murder, appellant denied he had acted with malice, and the judge declined to accept the guilty plea.

After the jury had been selected, and before opening statements, the judge informed the jury that appellant's attorney had 'misspoken' during the arraignment when he said appellant was pleading GBMI, and that in fact appellant was pleading 'not guilty.'

On appeal, appellant contends the trial judge committed reversible error in refusing to accept the plea, and in telling the jury that appellant's plea had changed from GBMI to not guilty. While appellant now contends he was attempting to enter a GBMI plea, the record reflects the trial judge believed it was intended to be a guilty plea. No attempt was made during this proceeding to comply with the statutory requirement for a GBMI plea.[3] In addition, there was no objection to the judge's refusal to accept the plea nor to the judge's informing the jury that appellant was pleading 'not guilty' rather than GBMI. Since there were no objections made at trial, there is nothing preserved for this Court's appellate review. *E.g., State v. Huggins,* 336 S.C. 200, 519 S.E.2d 574 (1999) (it is well settled that issues cannot be raised for the first time on appeal).

### 3. Second Competency Hearing

After the defense rested in the guilt phase of trial, court adjourned for lunch. When court resumed after lunch, the trial judge announced that appellant and the attorneys had met in his office because appellant wished to discuss (again) his desire to plead guilty. The judge then questioned appellant in open court whether he wished to plead, and whether appellant understood that, if he did enter a guilty plea, his right to be sentenced by the jury would cease and the trial judge alone would decide the sentence. Following this discussion, the trial judge ordered a recess so that appellant could consult with his attorneys.

When court resumed, appellant's attorneys asked the judge to have appellant reexamined for competency. They explained that appellant was talking about the voices telling him what to do, and they questioned his ability to assist them, and his competency to choose between continuing with the jury trial or entering a plea. The judge denied their request, and explained his decision at great length and in precise detail. The trial judge had observed appellant throughout the guilt phase proceedings. He found that appellant's conduct was consistent throughout the proceedings, and that appellant had not decompensated in the manner that his experts had pre-

---

3. *See* S.C. Code Ann. § 17-24-20(D) (Supp.2001).

dicted. Accordingly, the trial judge concluded that appellant remained competent.

Whether to order a competency examination rests in the trial judge's discretion, and his decision will not be overturned on appeal absent a clear showing of an abuse of that discretion. *State v. Locklair*, 341 S.C. 352, 535 S.E.2d 420 (2000); *see also* S.C. Code Ann. § 44-23-410 (2002) (Whenever a judge of the Circuit Court ... has reason to believe that a person ... is not fit to stand trial ... the judge shall [order an examination] ...). Appellant has not shown a clear abuse of discretion. We defer to the trial judge, who was able to view appellant's demeanor. *See State v. Kelly, supra; State v. Bell, supra.*

### 4. Jury Instructions

Appellant next contends the trial judge erred when he failed to submit GBMI as a possible form of verdict in the guilt phase. Whether this was an error is not properly before the Court in this direct appeal since appellant neither requested the charge nor called its omission to the attention of the trial judge. *State v. Hicks*, 330 S.C. 207, 499 S.E.2d 209 (1998) (contemporaneous objection to omission of charge required to preserve issue even in capital case).

### 5. Photographs

Appellant contends the trial judge committed reversible error in the sentencing phase when he admitted twelve color photographs of the victim's body, six taken at the crime scene and six at the autopsy.[4] Assuming that appellant ade-

---

4. The photos may be described as follows:
   #1: right elbow and forearm wounds
   #2: right cheek wound
   #3: right foot--heel, arch, ball have bloodstains
   #4: left foot--bottom covered with blood
   #5: thigh/pelvic wound
   #6: thigh/pelvic wound
   #7: thigh/pelvic wound
   #8: right breast wound
   #9: right arm wounds and face wound
   #10: body when received for autopsy
   #11: remains of right arm
   #12: breast and face wounds after blood cleaned up.

84

quately preserved his objection,[5] we find no error.

In *State v. Franklin*, 318 S.C. 47, 456 S.E.2d 357 (1995), the defendant objected to the admission of seventeen crime scene photos and ten autopsy slides during the penalty phase of his trial, contending they were highly prejudicial and designed only to arouse the jury's passion. As in the present case, one of the aggravating circumstances alleged in *Franklin* was physical torture. We held that crime scene photos were highly relevant to the aggravator, and thus their relevance and probative value outweighed their prejudice. Further, the autopsy slides showing the cleaned-up body served to more clearly depict the full extent of the pre-mortem physical torture [the victim] suffered and to substantiate the testimony of the pathologist. *Id.*

Our decision in *Franklin* controls this issue. Appellant stated the shots were inflicted in this order: (1) right arm; (2) chest; (3) pelvic area; and (4) upper chest and face. According to appellant, the first shot 'tore up her whole arm' and knocked the victim to the floor. There was evidence that the arm wound was extremely painful, that the victim screamed after that first shot, and that as long as a minute and a half elapsed between the first and second shots. The photos illustrate the testimony regarding the location and the severity of the shotgun wounds, and are relevant to the physical torture aggravator. Their relevance and probative value outweigh their prejudicial impact.

We find no abuse of discretion in the admission of these photographs. *State v. Franklin, supra.*

### 6. Proportionality

■■■■ Appellant argues his death sentence should be vacated because his was a crime of passion, and because the aggravators are only 'technically' applicable. He also contends that the sentence is capricious in light of his mental disorder. We disagree.

---

5. Appellant's objection was made during a bench conference called when the State sought to introduce the first two photos. The ground(s) for the objection is not reflected in the record, although inferentially the argument advanced was that the probative value of the photographs was outweighed by their prejudicial effect.

There was evidence from which the jury could have concluded that the victim suffered such that she was physically tortured. Further, the breaking down of the screen door of the trailer while armed with a shotgun was more than a 'technical' burglary. There was evidence from which the jury could have concluded that, despite his mental disorder, appellant planned to confront the victim and to kill her.

Further, the death penalty here is proportionate to other cases where the murder resulted from domestic problems. *E.g., State v. Kelly, supra; State v. Ard,* 332 S.C. 370, 505 S.E.2d 328 (1998). Finally, while it violates the Eighth Amendment to impose a death sentence on a mentally retarded defendant, *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the imposition of such a sentence upon a mentally ill person is not disproportionate. *State v. Wilson,* 306 S.C. 498, 413 S.E.2d 19 (1992).

We have conducted the sentencing review mandated by § 16-3-25, and find this sentence proportionate to others arising from domestic disputes. *State v. Kelly, supra; State v. Ard, supra.* Appellant's conviction and sentence are

AFFIRMED.

TOAL, C.J., MOORE, WALLER and BURNETT, JJ., concur.